**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JAMES JOHNSON,<br><br>       Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>       Defendant. | CASE NO. 3:25-CV-00658-AMK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**<u>MEMORANDUM OPINION AND ORDER</u>** |

Plaintiff James Johnson seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 6.)

For the reasons set forth below, the Court **REVERSES** and **REMANDS** the case pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order. On remand, the ALJ should consider the entire record and provide an accurate and well-reasoned explanation to support her findings regarding the persuasiveness of all medical opinion evidence, including the medical opinions of treating physician Jeffrey Harwood, M.D., and ensure that her stated rationale builds an accurate and logical bridge between the evidence and the result.

1

## I.  Procedural History

Mr. Johnson filed applications for DIB and SSI on November 22, 2021, alleging a disability onset date of August 24, 2021.[1]  (Tr.  316, 331.)  He alleged disability due to degenerative disc disease, herniated disc L5-S1, asthma, COPD, Barrett's Esophagus, anxiety, depression, GERD, duodenogastric reflux of bile, and sepsis.  (Tr. 317, 332.)

Mr. Johnson's applications were denied initially (Tr. 316, 331) and upon reconsideration (Tr. 346-47).  He requested a hearing (Tr. 416-17), and a telephonic hearing was held before Administrative Law Judge ("ALJ") on September 8, 2023 (Tr. 253-88).  On February 5, 2024, the ALJ issued a decision finding Mr. Johnson has not been under a disability within the meaning of the Social Security Act from August 24, 2021, through the date of the decision.  (Tr. 13-46.)  Mr. Johnson requested review of the ALJ decision by the Appeals Council.  (Tr. 568-70.)  On February 6, 2025, the Appeals Council declined to review the ALJ decision, making it the final decision of the Commissioner.  (Tr. 1-7.)

Mr. Johnson filed the present Complaint on April 3, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 10, 12).  In his sole assignment of error, Mr. Johnson argues the ALJ erred in evaluating the persuasiveness of the medical opinions of Dr. Jeffrey Harwood, Plaintiff's primary care physician.  (ECF Doc. 10, pp. 22-25.)

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Mr. Johnson was born in 1976 and was 45 years old on the alleged disability onset date, making him a younger individual under Social Security regulations on the alleged onset date.

---

[1] Mr. Johnson filed previous applications for DIB and SSI in 2013, which were denied by an ALJ on February 27, 2015.  (Tr. 289-309.)

2

(Tr. 317.)  He had at least a high school education.  (Tr. 267.)  Mr. Johnson had not worked since August 24, 2021, the alleged onset date.  (Tr. 318.)

**B.      Medical Evidence**

   **1.        Relevant Treatment History[2]**

On March 22, 2021, Mr. Johnson attended a primary care visit with Jeffrey Harwood, M.D., at the Family Medicine Office of the Fisher-Titus Medical Center ("Fisher Titus"), following up on a recent hospital admission for acute exacerbation of COPD without acute pneumonia.  (Tr. 1052.)  Dr. Harwood noted that Mr. Johnson previously followed with providers at Bellevue but was looking to fully transition his care to Fisher Titus.  (Tr. 1053.)  Dr. Harwood diagnosed COPD with emphysema and OSA.  (*Id.*)

A cervical x-ray on May 18, 2021, showed moderate right neural foraminal narrowing and mild stable anterolisthesis changes at C3-4 with no evidence of instability.  (Tr. 751.)

Mr. Johnson presented to Samuel Yonan, M.D. at Comprehensive Pain Care Center, Inc. on May 27, 2021, for a lumbar epidural steroid injection to treat displacement of a lumbar intervertebral disc without myelopathy and lumbar radiculopathy.  (Tr. 1683.)  The next day, Mr. Johnson underwent an electromyogram study ("EMG") of his lower extremities.  (Tr. 1326-38.)  The EMG showed findings consistent with mild bilateral L5/S1 radiculopathies and definite evidence of a generalized process such as polyneuropathy.  (Tr. 1330.)  An MRI dated June 4, 2021 showed a small central and left paracentral disc protrusion at L5-S1.  (Tr. 1331.)  Dr. Yonan administered a second lumbar epidural steroid injection on June 24, 2021.  (Tr. 1690.)

At a neurology follow-up with Angela Lowe, PA-C, on July 22, 2021, Mr. Johnson's physical examination reflected normal gait, 5/5 strength, normal tone, and 2+ reflexes in all

---

[2] The Court's summary of the medical evidence is not exhaustive and is generally limited to the evidence cited in the parties' briefs that is relevant to the legal and factual issues before the Court.

extremities, but some decreased sensation in the right lower extremity.  (Tr. 751.)  PA-C Lowe prescribed a trial of Trileptal for neuropathic pain and instructed Mr. Johnson to continue with pain management.  (Tr. 752.)

Mr. Johnson underwent a physical therapy evaluation for neck pain with Jessica Kurtz, PT, at Fisher Titus on August 9, 2021.  (Tr. 1351-63.)  Physical examination of his cervical spine revealed a positive Spurling's sign on the right, negative cervical distraction test, increased pain with range of motion, tenderness upon palpation of the right cervical paraspinals and upper trapezius to posterior, anterior, and lateral deltoid, poor posture, and decreased cervical range of motion.  (Tr. 1356-57.)  Mr. Johnson responded positively to manual traction, and PT Kurtz recommended continued physical therapy.  (Tr. 1359.)  However, Mr. Johnson failed to appear for an August 20 appointment, canceled all further appointments, and was discharged from cervical physical therapy on September 2, 2021.  (Tr. 1364.)

Mr. Johnson was admitted to Fisher Titus from August 10 to August 12, 2021, to treat a COPD exacerbation, sepsis, and pneumonia.  (Tr. 1367.)  A CT of his chest confirmed bilateral pneumonitis.  (Tr. 1368-1369.)  While he was in the hospital, his physical examination findings included a full range of movement in the extremities, but with pain in the right shoulder on palpation and movement.  (Tr. 1373.)

Mr. Johnson attended a chiropractic evaluation with Nathan Phillips, D.C., at Sandusky Wellness Center on August 13, 2021.  (Tr. 793.)  He reported acute and constant pain in his lower back and legs.  (*Id.*)  His physical examination findings noted areas of spasm on palpation, hypomobility, end point tenderness indicative of subluxation at C4 and L5, decreased lumbar and cervical range of motion, cervical spasm, lumbar spasm, left hip high, and Kemps.  (Tr. 793-94.)  At a follow-up chiropractic appointment three days later, Mr. Johnson reported that his back and

4

legs felt much better overall, but he still experienced some numbness in the left leg. (Tr. 795.) His physical examination findings were unchanged from the previous visit. (*Id.*)

On August 16, 2021, Mr. Johnson underwent a physical therapy evaluation with Joseph Lewandowski, PT.OPT, at Sandusky Wellness Center for low back pain radiating to his left leg. (Tr. 780.) His physical examination findings noted a decreased lumbar range of motion, positive straight leg raise ("SLR") test on the left, and increased tone and tenderness to the left quadriceps, gluteus medial, and lumbar paraspinal muscles. (Tr. 781.) PT Lewandowski recommended a six-week physical therapy plan. (*Id.*)

On August 18, 2021, Mr. Johnson received the first of four planned myofascial trigger point injections at Sandusky Wellness Center. (Tr. 791-92.) He returned for a second injection on August 25, 2021, stating that his symptoms had improved (Tr. 792), but the record does not show he received the last two injections. On August 19, 2021, he received a third lumbar epidural steroid injection with Dr. Yonan. (Tr. 1702.)

On August 24, 2021, Mr. Johnson presented at the Fisher-Titus emergency room ("ER") due to worsening low back pain radiating down his left leg. (Tr. 1398.) He reported he had been coughing due to his respiratory issues, heard a pop in his back, and then felt new pain radiating down his right leg. (*Id.*) He also reported ongoing chronic left lower extremity weakness and pain with ambulation. (*Id.*) Physical examination findings included diminished patellar reflex on the left, decreased strength with plantar flexion on the left, subjective sensory changes over the buttocks, intact extension/flexion in the knees and hips, and a slow, careful, but normal gait. (Tr. 1399.) Mr. Johnson was discharged from the hospital with prescriptions for cyclobenzaprine, naproxen, and oxycodone, and instructions to follow up with Dr. Timothy Moore. (Tr. 1401.)

An MRI of the thoracic and lumbar spines was conducted at the hospital on August 25, 2021.  (Tr. 1395-98 (dup. at 878-79).)  As to the lumbar spine, it showed a moderate to large sized central and left paracentral disc protrusion at L5-S1, with marked interval progression of the size of the disc protrusion from a prior study.  (Tr. 1395.)  As to the thoracic spine, it showed findings consistent with ventral cord herniation at T6-7 and T9 as well as degenerative changes and chronic mild vertebral body wedging of the mid to lower levels.  (Tr. 1397.)

Mr. Johnson attended a primary care visit with Dr. Harwood on August 26, 2021, to follow up on a recent emergency room visit for dyspnea.  (Tr. 1064-65.)  Dr. Harwood noted that Mr. Johnson was more concerned about ongoing back pain, which had worsened with coughing due to his pneumonia; he was reportedly at the emergency room for back pain two days prior.  (Tr. 1065.)  Dr. Harwood diagnosed a lumbar disc herniation and prescribed a short course of oxycodone to last until Mr. Johnson's upcoming pain management visit.  (Tr. 1065-66.)

On August 30, 2021, Mr. Johnson attended a pain management appointment with Dr. Yonan, reporting a flare up of his constant, moderately severe lumbar pain.  (Tr. 1667-71.)   His physical examination revealed a painful range of motion in the lumbar spine, facet tenderness bilaterally over the L5-S1 and the lumbar area, and sacroiliac joint tenderness bilaterally.  (Tr. 1669.)  Examination findings also included: painful SLR test on the right; normal strength, sensation, and reflexes of the upper extremities; 5-/5 strength in the lower extremities; decreased sensation and strength in the right lower extremity; and normal strength and sensation in the left lower extremity.  (*Id.*)  Mr. Johnson's gait was normal, and his fine motor was intact.  (*Id.*)  Dr. Yonan instructed him to ice, stretch, and exercise at home (Tr. 1670), recommended staying off work (Tr. 1671), refilled prescriptions for Baclofen and Lyrica (Tr. 1670), and prescribed a short course of Ultram (*id.*).

6

On September 2, 2021, Mr. Johnson presented to Zachary Zumbar, M.D., at the Fisher Titus pain management center for a consultation about his low back and left leg pain.  (Tr. 814-16.)  He rated his pain as 7 to 9 out of 10.  (Tr. 814.)  He reported that he experienced worsening pain since receiving an epidural steroid injection from Dr. Yonan's two weeks prior, and that he needed a cane.  (*Id.*)  He also reported pain and numbness on the side of his left leg to his foot and left-leg weakness.  (*Id.*)  On examination, he had normal strength and muscle tone, bilateral lumbar tenderness, worse on the left side, a positive SLR test on the left, and decreased sensation over the lateral aspect of the left leg below the knee.  (Tr. 815.)  After reviewing the recent lumbar MRI, Dr. Zumbar recommended surgery.  (*Id.*)

On September 7, 2021, Mr. Johnson attended a new patient spine consultation at New London Family Practice with Amanda Springer, PA-C, and Timothy Moore, M.D.  (Tr. 900-09.) He rated his lower back and right leg pain as 8/10 and 10/10 with certain movements.  (Tr. 901.) A physical examination showed positive seated and contralateral seated SLR tests, but normal strength and range of motion other than in the left ankle dorsiflexion ("ADF") and extensor hallucis longus ("EHL").  (Tr. 904.)  Mr. Johnson ambulated with a cane and had difficulty walking due to left leg pain.  (*Id.*)  PA-C Springer ordered a lumbar CT and instructed Mr. Johnson to return for a preoperative appointment.  (Tr. 908.)  Surgery was later scheduled for November 23, 2021.  (Tr. 1407.)

Mr. Johnson presented for a neurology follow-up with PA-C Lowe at Norwalk Advanced Neurologic Associates, Inc., on September 13, 2021.  (Tr. 915-16.)  He reported right shoulder and neck pain that was 8/10, with numbness in the arm and fingers, and back pain that was 10/10 radiating into the left leg, with numbness and tingling in both legs.  (Tr. 915.)  Trileptal had helped the back pain temporarily, but then his back pain increased.  (*Id.*)  He had trouble with

balance and used a cane.  (*Id.*)  On physical examination, his strength, tone, and reflexes were normal in all extremities, but with somewhat decreased sensation in the lower right extremity.  (Tr. 915-16.)  PA-C Lowe increased Mr. Johnson's dose of Trileptal.  (Tr. 916.)

On September 19, 2021, Mr. Johnson returned to the ER at Fisher Titus and was diagnosed with middle lobe pneumonia.  (Tr. 1415-16.)  He had attended a pain management appointment with Dr. Yonan on that same day (Tr. 1673-77), where his physical examination showed: normal range of motion of the upper extremities, hips, and knees bilaterally; pain with rotation, with lateral flexion bilaterally, and with flexion and extension of the lumbar spine; facet tenderness bilaterally over the L5-S1; spinous process tenderness over the lumbar area; sacroiliac joint tenderness bilaterally; a painful SLR test; normal strength, sensation, and reflexes of the left lower extremity and the upper extremities bilaterally; and decreased strength and sensation in the right lower extremity (Tr. 1675).  Dr. Yonan prescribed baclofen, Ultram, Lyrica, and Tylenol and recommended home exercises.  (Tr. 1676.)

A CT of his lumbar spine on October 19, 2021, in preparation for his upcoming low back surgery, showed a disc herniation with extrusion at the L5-S1 level, posteriorly and to the left of midline, with associated spinal canal stenosis at L5-S1.  (Tr. 1420.)

Mr. Johnson returned to see Dr. Yonan on October 25, 2021, reporting moderate pain and walking with a cane.  (Tr. 1706.)  On examination, he displayed: decreased range of motion with pain in the neck and spine, and tenderness over the right shoulder; a painful SLR test bilaterally; normal range of motion in the hips and knees bilaterally; normal strength, sensation, and reflexes of the upper extremities; and decreased strength, sensation, and S1 reflex in the right lower extremity.  (Tr. 1706-07.)  He walked with an abnormal gait.  (Tr. 1707.)  Dr. Yonan refilled and continued prescriptions from the previous appointment.  (Tr. 1708.)

On November 16, 2021, Mr. Johnson's scheduled back surgery was cancelled because he had been contracting pneumonia every month and a half, and frequently aspirated at night. (Tr. 1439.) On November 21, 2021, Mr. Johnson went to the Fisher Titus ER with shortness of breath, cough, and fever. (Tr. 1447.) He was diagnosed with acute asthma exacerbation and community-acquired pneumonia. (Tr. 1448.)

Mr. Johnson returned to the ER on December 6 with increased shortness of breath and cough with labored respiration; he reported his symptoms had returned after he finished the course of antibiotics prescribed at the previous visit. (Tr. 1459.) He was diagnosed with pneumonia and sent home after his symptoms improved. (Tr. 1460.) He was later admitted to the hospital from December 15 to 20 for sepsis, acute exacerbation of COPD, acute respiratory failure, and healthcare-acquired pneumonia. (Tr. 1465.)

Mr. Johnson was again admitted to Fisher Titus from December 29, 2021 to January 4, 2022, due to sepsis caused by recurrent pneumonia. (Tr. 1503-04.) During this hospital stay, Mr. Johnson consulted with Maher Salam, M.D., a gastrointestinal specialist who opined that Mr. Johnson's recurrent hospitalizations for chemical pneumonia likely stemmed from his gastric reflux. (Tr. 1526.) Dr. Salam performed an esophagogastroduodenoscopy ("EGD"), which showed a "very long segment of salmon colored mucosa consistent with Barrett's esophagus and a 4 cm sliding hiatal hernia." (Tr. 1527.) He recommended treatment for Barrett's esophagus and hiatal hernia surgery to address recurrent chemical pneumonitis. (Tr. 1529.)

On January 15, 2022, Mr. Johnson went to the ER following a car accident. (Tr. 1577.) On examination, his movement and sensation were intact in all extremities. (Tr. 1578.) He was diagnosed with left chest wall contusions, a cervical sprain, and musculoskeletal pain. (Tr. 1579.) He was discharged with prescriptions for cyclobenzaprine and ibuprofen. (Tr. 1580.)

On January 19, 2022, Mr. Johnson presented to Bryce M. Kreicher, D.C., at Health Solution Centers of Sandusky.  (Tr. 2310-13.)  He sought chiropractic treatment for injuries stemming from his recent car accident.  (Tr. 2310.)  He reported headaches and neck and back pain that had worsened since the accident.  (*Id.*)  A range of motion analysis showed limited range of motion at all areas of the spine.  (Tr. 2311.)  Further testing showed localized neck pain with radiculopathy on the right and left, localized lumbosacral pain, possible cervical sprain and nerve root compression, and moderate hypertonicity, tenderness, and spasm with palpation of cervical, thoracic, and lumbar musculature.  (*Id.*)  Hypo-mobile vertebral subluxations were found and adjusted at C2, C5, C6, T1, T2, T4, T12, L1, and L5.  (*Id.*)  Dr. Kreicher recommended chiropractic treatment three times a week for four to six weeks.  (Tr. 2313.)

Mr. Johnson attended a primary care visit with Dr. Harwood regarding his car accident on January 21, 2022.  (Tr. 1084-86.)  He reported migraines, neck pain, paresthesia in his hand and fingers, and "slightly increased" lower back pain.  (Tr. 1084-85.)  A physical examination showed decreased range of motion in the neck, mild impingement on the left, and tenderness to palpation over the top of the right shoulder, the left paracervical muscle, and the mid scapular level bilaterally.  (Tr. 1085.)  Dr. Hardwood prescribed baclofen and amitriptyline to supplement the medications prescribed at the ER.  (*Id.*)

Mr. Johnson attended a pain management appointment with Dr. Yonan on February 1, 2022.  (Tr. 1720-24.)  He walked with a cane (Tr. 1722) and reported increased neck pain following his car accident, in addition to constant, moderately severe lumbar, thoracic, left knee, and right hip pain (Tr. 1720).  The pain was helped by Tylenol and other pain pills and exacerbated by rotation and repetitive movements.  (*Id.*)  A physical examination showed: pain limiting rotation, flexion, and extension of the neck; tender cervical facets bilaterally over C4-5,

10

C5-6, and C6-7; normal range of motion on the left shoulder; reduced range of motion in the right shoulder with pain; tenderness over right shoulder; pain with flexion, extension, and rotation of the spine; painful SLR test bilaterally; normal range of motion in the hips and knees bilaterally; decreased strength and sensation and diminished reflexes in the right lower extremity; and normal strength, sensation and reflexes in the upper extremities. (Tr. 1722-23.) A recent x-ray showed multilevel C3-4, C5-6 degenerative disc disease. (Tr. 1724.) A physical examination conducted at a February 28, 2022 follow-up appointment was unchanged. (Tr. 1728-29.) At both appointments, Dr. Yonan recommended ice, stretching, and strengthening exercises, prescribed Lyrica, and continued baclofen, Ultram, and Tylenol. (Tr. 1724, 1730.)

Mr. Johnson returned to see Dr. Harwood on February 21, 2022. (Tr. 1087-89.) He reported that seeing a chiropractor twice a week was helpful, and his headaches and neck pain were improving. (Tr. 1088.) He was able to get up and down from a chair easily and did not appear in distress. (*Id.*) Dr. Harwood prescribed trazodone instead of amitriptyline to treat headaches and continued all other medications. (Tr. 1088-89.)

Mr. Johnson received regular chiropractic treatment with Dr. Kreicher from January 20, 2022 through April 7, 2022. (Tr. 2314-36.) By April 7, 2022, his back pain was down to a 5/10, and he had noticed an increase in flexibility, functioning, and range of motion. (Tr. 2335.) He also showed improvement with muscle hypertonicity, fewer trigger points, and reduction in swelling. (*Id.*) Dr. Kreicher released Mr. Johnson from active care. (Tr. 2336.)

On May 19, 2022, Mr. Johnson underwent gastric bypass surgery and surgical repair of his sliding hiatal hernia. (Tr. 3122-23.) He was discharged on May 21, 2022. (Tr. 3122.) By June 2, 2022, Mr. Johnson had lost 30 pounds as a result of the gastric bypass surgery and told his cardiologist that he felt "much better." (Tr. 2228.)

11

On May 24, 2022, Mr. Johnson followed up with Dr. Harwood.  (Tr. 2434-36.)  He reported continuing back pain, with difficulty sitting in chairs and standing from a seated position.  (Tr. 2434.)  Dr. Harwood noted that Dr. Yonan had moved out of the area, so Mr. Johnson was no longer receiving pain management treatment.  (*Id.*)  He added a prescription for Tramadol to treat pain from degenerative disc disease.  (Tr. 2435.)

Mr. Johnson underwent a consultative examination with Casey Norris, D.O., on July 17, 2022.  (Tr. 1817-19.)  He reported low back pain that radiated down his bilateral lower extremities, causing weakness and numbness.  (Tr. 1817.)  On physical examination, Mr. Johnson's gait was normal, and he was able to get on and off the exam table without difficulty.  (Tr. 1818.)  He could hop, squat, and tandem walk but could not walk on his toes or heels, reporting his balance was too poor to perform.  (*Id.*)  Dr. Norris noted tenderness to palpation over the lumbar spine, exacerbated thoracic kyphosis, and a positive SLR test bilaterally at 80 degrees, accompanied by sharp shooting pain in the low back.  (*Id.*)  Range of motion was "without limitation" at the cervical and lumbar spines and in all extremities.  (Tr. 1819.)  Fingering and gross grip were 5/5 bilaterally.  (*Id.*)  Dr. Norris also performed a spirometric test (Tr. 1813-14) and diagnosed a moderately severe lung obstruction (Tr. 1814).

On August 7, 2022, Mr. Johnson attended a follow-up with Dr. Harwood.  (Tr. 1890-93.)  He had lost 85 pounds following bariatric surgery; this had reduced but not eliminated his low back pain and improved his breathing.  (Tr. 1891.)  Dr. Harwood renewed Tramadol, pregabalin, and baclofen for back pain.  (Tr. 1892.)  He also refilled Mr. Johnson's inhaler, noting that Mr. Johnson's asthma had likely related to aspiration events and would improve over time.  (*Id.*)

On September 6, 2022, Mr. Johnson attended a surgical consultation with Dr. Moore.  (Tr. 2244.)  A physical examination showed a significantly positive SLR on the left, a positive

12

contralateral SLR on the right, and "a little bit" of weakness with plantar flexion on the left.  (*Id.*)

Dr. Moore diagnosed left-sided L5-S1 herniated disc with left lower extremity radiculopathy and

ordered an MRI of the lumbar spine.  (*Id.*)  A September 14, 2022 MRI showed interval decrease

in the size of the disc complex at L5-S1 compared to the August 2021 imaging.  (Tr. 2026-27.)

Mr. Johnson returned to see Dr. Moore on November 1, 2022 for a preoperative

appointment.  (Tr. 3138.)  While the MRI showed a smaller disc complex, Dr. Moore noted that

it was "likely scarred to the nerve root that it is still abutting," and continued to recommend

surgery.  (*Id.*)  On November 8, 2022, Mr. Johnson underwent a left-sided L5-S1 laminotomy

and an L5-S1 discectomy with Dr. Moore.  (Tr. 3575-76.)

Mr. Johnson attended a primary care appointment with Dr. Harwood on November 17,

2022.  (Tr. 3619-21.)  He reported that his right leg no longer hurt, and he had better sensation in

the left leg, but he still experienced some left leg and sciatic pain.  (Tr. 3619.)  He also reported

ongoing neck pain and said he was constantly dropping things because of the pain.  (*Id.*)  Dr.

Harwood completed a disability form indicating that he suspected Mr. Johnson would continue

to be permanently disabled by his chronic neck and low back pain but noted that Mr. Johnson's

long-term outcome was not known.  (Tr. 3620.)  He continued Mr. Johnson's prescriptions.  (*Id.*)

That same date, Mr. Johnson presented at the Fisher Titus ER, complaining of back pain

after standing up, twisting, and feeling a "pop" in his back.  (Tr. 3578.)  An evaluation showed

normal vitals, no signs of infection, and intact staples, and he was discharged with instructions to

keep an upcoming appointment with his surgeon.  (Tr. 3579.)  An x-ray of the lumbosacral spine

completed the next day showed mild s-shaped scoliosis of the thoracolumbar spine with possible

mild degenerative disc disease at L1-L2.  (Tr. 3647.)

On December 13, 2022, Mr. Johnson presented to PA-C Springer at Dr. Moore's office. (Tr. 3643-48.)  He reported feeling well for about 10 days after surgery but that he was "doing terribly" since twisting and feeling a "pop" in his back.  (Tr. 3643.)  He went to the ER, but "they did not do anything." (*Id.*)  His pain was a 9/10, he was using a cane, and he reported lower back pain radiating into the left leg with numbness and tingling. (*Id.*)  On examination, he had normal strength and range of motion except bilateral ADF and EHL 4+/5.  (Tr. 3645-46.)

On December 19, 2022, Mr. Johson underwent a post-operative lumbar MRI.  (Tr. 3549-51.)  It showed recent post-operative changes consistent with a left L5 hemilaminectomy, intraspinal intrathecal soft tissue edema of the canal at L5-S1, and resulting moderate narrowing of the central spinal canal, with narrowing of the left lateral recess and severe narrowing of the left neural foramen.  (Tr. 3651.)

On January 9, 2023, Mr. Johnson presented to Dr. Harwood after falling in a Menard's bathroom.  (Tr. 3622-24.)  He reported burning, clicking, and popping in his neck since the fall, as well as numbness in his fingers, and some low back and head pain.  (Tr. 3622.)  Dr. Harwood diagnosed cervical strain and low back pain syndrome.  (Tr. 3623.)  He encouraged Mr. Johnson to give his neck pain time to heal on its own and noted that a follow-up was scheduled the next day to review the December MRI. (*Id.*)

Mr. Johnson followed up with PA-C Springer on January 10, 2023 for review of the MRI. (Tr. 3652-59.)  He reported 10/10 low back pain radiating into his left leg.  (Tr. 3652.)  A physical examination showed normal range of motion, normal strength except decreased strength in the left ADF and EHL ligaments, intense pain, and a positive SLR test on the left.  (Tr. 3656.) Mr. Johnson ambulated with a cane. (*Id.*)  He declined a referral to pain management or additional injections, stating that he "just wanted to get it fixed."  (Tr. 3657.)

14

On March 9, 2023, Mr. Johnson attended a physical therapy evaluation with Lisa Myatt, PT, to address muscle strain in his neck. (Tr. 3750-58.) Mr. Johnson reported his neck pain was 4/10, and he felt constant numbness and tingling into the right hand and forearm. (Tr. 3750.) On physical examination, he demonstrated: normal range of motion in the upper left extremity and impaired range of motion in the right upper extremity; severely antalgic gait with use of a straight cane; and decreased cervical range of motion. (Tr. 3754.) PT Myatt recommended outpatient physical therapy two to three times a week for four to eight weeks. (Tr. 3757.)

On April 13, 2023, Mr. Johnson returned to see Dr. Harwood and reported that he had completed physical therapy for his neck pain, but it had not been helpful; he felt like it made his symptoms worse. (Tr. 3807.) He also reported: a burning sensation when turning his head to the left; difficulty moving his neck to the right; pain, tingling, and numbness in his right hand; and numbness and tingling in both legs. (*Id.*) On examination, he sat guardedly without moving his neck, had decreased strength in the right upper extremity, and displayed limited lateral range of motion and very limited cervical range of motion. (Tr. 3808.) Dr. Harwood diagnosed cervical strain and cervical spondylosis with myelopathy and ordered an MRI of the cervical spine. (*Id.*)

Mr. Johnson was discharged from physical therapy on April 14, 2023 (Tr. 3823), but he continued to rate his neck and right shoulder pain at 8/10 and complained of constant numbness and tingling in his right upper extremity (Tr. 3826). He underwent an MRI of the cervical spine on April 19, 2023, and it was negative. (Tr. 3810.)

### 2. Opinion Evidence

#### i. Treating Source

Mr. Johnson's primary care provider, Dr. Harwood, completed a Medical Source Statement on November 17, 2022. (Tr. 3545-46.) He opined that Mr. Johnson could lift no more

than eight pounds, frequently or occasionally, and could sit for up to four hours total, but no more than half an hour at a time; he identified the supporting medical findings as: "Surgery restrictions." (Tr. 3545.) He also opined that Mr. Johnson could stand or walk up to four hours total in a workday, but no more than one hour at a time; he identified the supporting medical findings as: "Subjective." (*Id.*) He further opined that Mr. Johnson could: never climb, balance, stoop, crouch, kneel, crawl, push, or pull; rarely reach; and frequently perform fine and gross manipulation. (Tr. 3545-46.) Dr. Harwood also indicated that exposure to heights and moving machinery were environmental restrictions affecting Mr. Johnson's impairment; supporting medical findings included "mobility impairment" and "use of cane." (Tr. 3546.) He also noted prescriptions for a cane and a shower chair and checked a box indicating Mr. Johnson needed to be able to alternate between sitting, standing, and walking "at will." (*Id.*) He further opined that Mr. Johnson experienced "moderate" levels of pain that would interfere with concentration, take him off task, and cause absenteeism, and that Mr. Johnson would require additional unscheduled rest periods averaging an extra two hours per day. (*Id.*) When given an opportunity to identify additional limitations that would interfere with full time work, Dr. Harwood wrote: "Recent back surgery so long-term outcome technically not known, but expect he will have ongoing [low back pain] and be functionally disabled from physical work." (*Id.*)

Dr. Harwood completed a second Medical Source Statement on August 8, 2023. (Tr. 3952-53.) He opined that Mr. Johnson could: lift or carry up to ten pounds, frequently or occasionally; stand and walk up to two hours in a workday, but less than half an hour at a time; sit for 45 minutes at a time; never climb, crouch, or kneel; rarely balance, stoop, crawl, or perform fine manipulations; and occasionally reach, push, pull, or and perform gross manipulations. (Tr. 3952-53.) He identified the supporting medical findings as "PE [physical

16

examination], Hx [medical history], symptoms, etc." (*Id.*)  He identified heights, moving machinery, temperature extremes, and humidity as environmental restrictions affecting Mr. Johnson's impairments.  (Tr. 3953.)  He noted Mr. Johnson's prescriptions for a cane and a transcutaneous electronic nerve stimulator ("TENS") unit for his neck and back pain and checked a box indicating Mr. Johnson needed to alternate positions "at will." (*Id.*)  He further opined that Mr. Johnson: had "moderate pain" that caused headaches and would interfere with concentration, take him off task, and cause absenteeism; and would require an average of more than four hours of extra break time daily.  (*Id.*)  When asked to identify additional limitations, Dr. Harwood cited examination findings of limited range of motion in the neck and impaired gait and ambulation.  (Tr. 3953.)

### ii.    Consultative Examiner

After a physical examination and pulmonary testing conducted on July 17, 2022 (Tr. 1813-18), consultative examiner Dr. Norris opined that Mr. Johnson could: walk for four to five hours in an eight-hour workday; be on his feet for a combined total of five hours; and "probably" carry less than 30 pounds frequently and more than 40 pounds "on occasion."  (Tr. 1819.)

### iii.    State Agency Medical Consultants

On August 1, 2022, state agency medical consultant Abraham Mikalov, M.D. completed a physical RFC assessment.  (Tr. 326-27, 341-42.)  He opined that Mr. Johnson could: occasionally lift/carry up to 20 pounds and frequently lift/carry up to 10 pounds; stand/walk and sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally stoop; and frequently balance, kneel, crouch, crawl, and climb ramps or stairs.  (Tr. 326, 341.)  He further opined that Mr. Johnson should avoid concentrated exposure to extreme

cold or heat, wetness, humidity, and respiratory irritants such as fumes, odors, and dust. (Tr. 326-27, 341-42.)

On December 27, 2022, state agency medical consultant, Elizabeth Das, M.D., affirmed many of Dr. Mikalov's findings on reconsideration (Tr. 359-361, 376-78), but reduced the stand/walk limitation to four hours in an eight-hour workday (Tr. 359), removed limitations on balancing and kneeling, reduced crouching, crawling, and climbing ramps/stairs to occasional, and added a limitation to avoid concentrated exposure to workplace hazards (Tr. 360).

## C.    Hearing Testimony

At a hearing on September 8, 2023, Mr. Johnson testified in response to questions from the ALJ and his attorney. (Tr. 255-80.) A Vocational Expert ("VE") also testified. (Tr. 280-87.)

The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform Plaintiff's prior work, but could perform representative positions in the national economy, such as mail clerk, routing clerk, and small products assembler. (Tr. 283-84.) If the individual required a straight cane for balance and ambulation, there would be no work available. (Tr. 285.) If the individual could never reach overhead and occasionally push, pull, and reach forward with the right upper extremity, there would be no work available. (Tr. 286.) If the individual needed to change positions between sitting, walking, and standing every 20 to 30 minutes, it would be work preclusive. (*Id.*) It would also be work preclusive if the individual would be off-task more than 15% of the time, absent more than one day per month, or needed more than two 15-minute breaks and one 30-minute lunch break. (Tr. 284.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, § 416.920[3]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

### IV.    Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: The ALJ Did Not Adequately Evaluate the Medical Opinions of Treating Source Jeffrey Harwood, M.D.**

In his sole assignment of error, Plaintiff argues the ALJ did not properly evaluate the persuasiveness of two medical opinions from his primary care provider Dr. Harwood. (ECF Doc. 10, pp. 22-25.) In particular, he argues the ALJ: (1) failed to properly "discuss whether Dr. Harwood's opinions are supportable and consistent with other evidence of record"; and (2)

21

committed "clear error" when he failed to even mention the second of Dr. Harwood's two opinions.  (*Id.* at pp. 22-23.)  The Commissioner argues in response that the ALJ: (1) "discussed both supportability and consistency" and ultimately made a decision "supported by substantial evidence"; and (2) did not err when she failed to mention Dr. Harwood's second medical opinion because the regulations only required her to address medical opinions "at the source level" and the ALJ's stated reasons for finding the first medical opinion inconsistent with the record "are just as valid with respect to the [second] opinion."  (ECF Doc. 12, pp. 7-10.)

### 1. Framework for the Evaluation of Medical Opinion Evidence

The regulations governing the evaluation of medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)."  20 C.F.R. § 404.1520c(a).  Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), (b)(2), (c)(1)-(5).  ALJs must therefore explain how they considered supportability[4] and consistency[5] but need not explain how they considered other factors.  20 C.F.R. § 404.1520c(b)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by

---

[4] As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

[5] As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

> **2.      The ALJ Did Not Adequately Articulate Her Findings Regarding the Persuasiveness of Dr. Harwood's Medical Opinions and Failed to Build an Accurate and Logical Bridge Between the Evidence and the Result**

Although the record contains two medical source statements from Dr. Hardwood—one from November 2022 (Tr. 3544-46) ("2022 opinion"), and one from August 2023 (Tr. 3952-53) ("2023 opinion")— the ALJ's written opinion only evaluates the persuasiveness of the 2022 opinion.  The ALJ analyzed Dr. Harwood's 2022 opinion as follows:

> The claimant's primary care provider, Jeffrey Harwood, MD submitted a medical source statement dated November 17, 2022 in which he opined the claimant can frequently and occasionally lift 8 pounds (due to surgery restrictions), stand and walk a total of four hours in an 8-hour work day but no more than one hour at a time (listing the basis for this opinion as "subjective" which is not a medical source statement, rather it is just a repetition of the claimant's reports) [], sit for no more than four hours in a workday but no more than one half hour at a time (due to surgery restrictions), never climb, balance, stoop, crouch, kneel, crawl, rarely reach, never push or pull, frequently perform fine and gross manipulation, should avoid heights and moving machinery due to use of a cane, requires a cane and shower chair, and needs a position that will permit him to shift positions at will. He further concluded the claimant would require two additional unscheduled breaks outside of typical breaks during the workday [].
>
> Notably, the lifting and sitting restrictions were surgical restrictions and do not represent an opinion as to the claimant's ongoing functioning beyond recovery from surgery during the immediate post-operative period. Neither Dr. Harwood's treatment records nor any postoperative records show these restrictions remain beyond the initial post-operative period as ordered by the surgeon []. Further, as Dr. Harwood noted, the limitation on standing/walking was based on subjective complaints. Additionally, the overall record does not support the extreme postural limitations to which Dr. Harwood opines, nor does it contain any findings supporting any manipulative limitations. With regard to use of a cane, although the cane is noted at rare appointments as discussed above, no objective record shows a need for a cane. Notably, the claimant has not been shown to have balance issues. His gait is mostly normal, with occasional reference to an altered gait as thoroughly discussed above. It is important to note that even Dr. Harwood concludes the

23

> claimant's long-term outcome is not known, although he assumes the claimant will have ongoing pain and be disabled from work [].
>
> At the medical appointment associated with completion of this form, Dr. Harwood similarly noted the claimant's future outcome could not be predicted []. Finally, this opinion was completed only nine days after the claimant's surgery. To say he would have ongoing pain that would be disabling for an extended period thereafter is conjecture and not supported by the overall record. For example, at the post-operative visit in December 2022, the claimant reported ongoing symptoms, but his musculoskeletal examination showed normal range of motion and normal strength. []. For all these reasons, this opinion is not found to be persuasive.

(Tr. 34 (emphasis added).)  It is clear that the ALJ only analyzed the 2022 opinion because she limited her summary to the 2022 opinion findings, repeatedly referenced the timing of the 2022 opinion (i.e., shortly after Plaintiff's surgery), and rebutted Dr. Harwood's identification of "[s]urgery restrictions" and "[s]ubjective" as the medical findings supporting the limitations.[6] (*Compare* Tr. 34 *with* Tr. 3545-46.)  In contrast, the 2023 opinion adopted different limitations, was written nine months later, and stated that the medical findings supporting the limitations included physical examination findings (including limited range of motion and impaired gait and ambulation), medical history, and "symptoms."  (*See* Tr. 3952-53.)

The Commissioner asserts that it was not error for the ALJ to limit her analysis to the 2022 opinion because the law only required the ALJ to address medical opinions "at the source level."  (ECF Doc. 12, p. 10 (citing 20 C.F.R. § 404.1450c(b)(1)).)  Although the regulations generally require ALJs to articulate "how persuasive [they] find all of the medical opinions . . . in [the] case record," 20 C.F.R. § 404.1520c(b) (emphasis added), the Commissioner is correct that an ALJ need not separately analyze multiple medical opinions from a single medical source.

---

[6] The ALJ did reference one notation from the 2023 opinion in her earlier discussion of Plaintiff's alleged need for a cane.  (*See* Tr. 27 (stating Plaintiff's "treating source not[ed] in August 2023, he has been prescribed a cane") (citing Tr. 3953).)  But there is nothing in that discussion or the remainder of the ALJ's written decision which references or evaluates the medical opinion findings contained in that medical source statement.

Instead, an ALJ need only provide "[s]ource-level articulation" of her persuasiveness findings when there are multiple opinions from a single medical source in the record, as follows:

> Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions . . . in [a] case record. Instead, when a medical source provides multiple medical opinion(s) . . . , we will articulate how we considered the medical opinions . . . from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion . . . from one medical source individually.

20 C.F.R. § 404.1520c(b)(1).

Although this source-level articulation provision excuses the ALJ from individually "articulat[ing] how [she] considered each medical opinion" from a single medical source, it still anticipates that she will "articulate how [sh]e considered the medical opinions"—plural—"from that medical source together in a single analysis." *Id.* In other words, the regulations do not require a separate, individual persuasiveness analysis for every medical opinion from a single source, but they do expect the ALJ to articulate how she considered the multiple "medical opinions . . . together in a single analysis." *Id.* Contrary to that expectation, the ALJ in this case did not articulate how she considered Dr. Harwood's 2022 and 2023 opinions "together in a single analysis" but instead limited her analysis to Dr. Harwood's 2022 opinion alone. (Tr. 34.)

The Commissioner argues that the ALJ's findings still provide an adequate "source-level" analysis of Dr. Harwood's opinions, even though she does not discuss the 2023 opinion, because "Dr. Harwood's 2023 assessment is even more restrictive than his 2022 opinion that the ALJ expressly discussed" and "the ALJ's reasons for finding the . . . 2022 [opinion] inconsistent with the record are just as valid with respect to the 2023 opinion." (ECF Doc. 12, p. 10.)

However, the ALJ's stated reasons for finding the 2022 opinion was not supported by Dr. Harwood's own objective findings and supporting explanations—i.e. "supportability"—are not

25

"just as valid with respect to the 2023 opinion."  First, the ALJ noted that Dr. Harwood identified the stated lifting and sitting limitations as "surgical restrictions," and therefore found those parts of the opinion did not "represent an opinion as to [Mr. Johnson]'s ongoing functioning beyond recovery from surgery during the immediate post-operative period."  (Tr. 34.)  But the same cannot be said for the 2023 opinion, which cited physical exams, medical history, and symptoms (not surgical restrictions) in support of similarly restrictive limitations in lifting and sitting.  (Tr. 3545.)  The ALJ also observed that the opined standing and walking limitations were "based on subjective complaints."  (Tr. 34.)  But again, the 2023 opinion cited to physical exams, medical history, and symptoms (not simply "subjective") in support of restrictive limitations in standing and walking.  (Tr. 3545.)  The ALJ also found: "It is important to note that even Dr. Harwood concludes the claimant's long-term outcome is not known, although he assumes the claimant will have ongoing pain and be disabled from work."  (Tr. 34 (citing Tr. 3546).)  But Dr. Harwood only indicated long-term outcomes were unknown in the 2022 opinion, shortly after Plaintiff's surgery; the 2023 opinion was completed nine months later and does not suggest long term outcomes are unknown.  (Tr. 3952-53.)  Finally, the ALJ observed that the 2022 opinion "was completed only nine days after [Plaintiff]'s surgery," and therefore found it was "conjecture" for Dr. Harwood to find Plaintiff "would have ongoing pain that would be disabling for an extended period thereafter[.]"  (Tr. 34.)  This observation is inapplicable to the 2023 opinion, which found similarly restrictive limitations and pain remained nine months after the surgery.  (Tr. 3952-53.)  Ultimately, the only part of the ALJ's analysis of supportability that might be applicable to the 2023 opinion was a finding that Dr. Harwood's treatment records did not show the opined restrictions in lifting and sitting remained "beyond the initial post-operative period."  (Tr. 34.)

26

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Hum. Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)). "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history[.]" *Id.*; *see also* 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record).

An ALJ need not "discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)). But she must perform "a proper analysis of the medical evidence under agency regulations and controlling case law," and may not "cherry-pick[] select portions of the medical record" to support her findings. *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where ALJ was "selective in parsing the various medical reports"). In other words, an ALJ cannot simply "pick and choose" evidence in the record, "relying on some and ignoring others, without offering some rationale for his decision." *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004). Instead, the ALJ's explanation must "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877; *see id.* at 881 ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore

evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.") (citations omitted).

Here, the regulations did not require the ALJ to individually articulate a persuasiveness analysis for each of Dr. Harwood's medical opinions, but they did require the ALJ to consider both opinions "together in a single analysis." 20 C.F.R. § 404.1520c(b)(1).  The ALJ did not provide an adequate "source-based analysis" of Dr. Harwood's opinions because she addressed only one of opinions, rather than addressing both opinions "together in a single analysis."

The ALJ was also required to perform "a proper analysis of the medical evidence under agency regulations and controlling case law" without "cherry-pick[ing] select portions of the medical record" to support her findings.  *Minor*, 513 F. App'x at 435.  But the ALJ's focus on the 2022 opinion alone skewed her analysis of supportability because she focused almost exclusively on criticisms that were inapplicable to the 2023 opinion, like Dr. Harwood's reliance on "surgical restrictions" for certain limitations and his "conjecture" or admitted lack of knowledge as to long-term outcomes due to the proximity between Plaintiff's surgery and the opinion date. Indeed, not only were many of the ALJ's criticisms inapplicable to the 2023 opinion, some of those criticisms could have been undermined by a discussion of the 2023 opinion.  For example, the ALJ discounted Dr. Harwood's opined sitting and lifting limitations as not representing "an opinion as to [Plaintiff]'s ongoing functioning" because they were based on "surgical restrictions"; but this finding may have been undermined by recognition that Dr. Harwood found similar limitations appropriate over nine months later, this time based on physical exam findings, medical history, and symptoms rather than "surgical restrictions."  Similarly, the ALJ's repeated emphasis on the "conjecture" inherent to Dr. Harwood's opinions regarding long-term limitations shortly after surgery may have been undermined by acknowledging the subsequent medical

28

opinion in which the same treating source found similarly restrictive limitations remained applicable nine months after surgery was complete.

Because it is ultimately not clear whether or how the ALJ factored Dr. Harwood's 2023 opinion into his persuasiveness findings, and because it further appears that consideration of 2023 opinion could have changed the ALJ's analysis, the Court finds the ALJ inadequately articulated her analysis of Dr. Harwood's medical opinions and failed to build "an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Accordingly, the Court finds that Plaintiff's sole assignment of error has merit and remands the ALJ's decision for further proceedings consistent with this Order.

## V.     Conclusion

For the foregoing reasons, the Court **REVERSES and REMANDS** the case pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should consider the entire record and provide an accurate and well-reasoned explanation to support her findings regarding the persuasiveness of all medical opinion evidence, including the medical opinions of treating physician Jeffrey Harwood, M.D., and ensure that her stated rationale builds an accurate and logical bridge between the evidence and the result.

March 31, 2026

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

29